UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| DEBRA RHEAM, | ) | |
|---|---|---|
| Plaintiff, | ) ) ) | |
| v. | ) ) | No. 1:08-CV-41 PS |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | ) ) ) ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

Debra Rheam, a *pro se* plaintiff, was denied Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) and now seeks a review of that decision. On November 18, 2004, Rheam filed an application for DIB and SSI, alleging that she became disabled on February 8, 2003, due to lower back and left leg pain. Following a hearing before an Administrative Law Judge, Rheam's application for benefits was denied on the grounds that she could perform a significant number of jobs in the national economy. That decision was supported by substantial evidence; therefore, the decision of the Commissioner of the Social Security Administration (SSA) is affirmed.

**I. BACKGROUND**

Rheam filed application for DIB and SSI, alleging that she had been unable to work since February 8, 2003, due to lower back and knee pain. (R. 75-82.) The record reveals that Rheam is a 48 year-old woman with a 10th-grade education and two-months of truck driving training. (R. 464-65.) Her past work experience includes employment as a cashier/stocker at a retail store, a dump truck driver for an asphalt company, and a production worker/inspector in a factory. (R. 466-68.) Since February 2003, Rheam has worked various temporary jobs, none lasting more

than twelve weeks. (R. 466-67.) Rheam was not discharged and did not quit any of these jobs due to her disability. (R. 13, 93, 97, 122, 466, 467.) Rheam has been unemployed since January 2007. (R. 465.)

Rheam claims that she has been disabled since February 8, 2003, due to lower back pain and left knee pain. (R. 449, 451-53.) Rheam's history of left knee pain dates back to April 1999, when she was injured in an automobile accident. (R. 144.) She had surgery to repair her knee on June 25, 2001. (R. 140.) By July 26, 2001, Rheam was cleared to "return to her work activities." (R. 138.) On January 15, 2002, Rheam complained of some discomfort in her left knee, but her physician was unable to confirm the source of the pain and noted that there was no physical explanation for her discomfort. (R. 134.) Nonetheless, the examining physician recommended a course of physical therapy, but Rheam decided to discontinue her therapy after only four visits. (R.131.)

Degenerative disk disease causes Rheam chronic pain in her back. (R. 125.) This pain apparently also started after an automobile accident, though it is not clear in the record whether this was the same accident that caused her knee pain. (R. 129, 184.) Rheam's back pain was aggravated by the lifting she did at work. (R. 184.) On May 15, 2003, an MRI revealed that Rheam's degenerative disk disease was "basically unremarkable," with mild degenerative change. (R. 182-83.) In 2005, Rheam received a series of lumbar steroid injections to relieve her pain. (R. 253, 272, 287.) On October 29, 2005, an MRI revealed "mild to moderate disc bulge . . . mild central canal stenosis . . . [and] some degree of facet arthropathy." (R. 248.)

The medical records indicated possible other impairments, which the ALJ considered in his analysis, but which were not claimed by Rheam in her application, including: right shoulder tendinitis, fibromyalgia, and various mental impairments. (R. 13.) On June 14, 2004, Rheam had

arthroscopic surgery on her right shoulder. (R. 172.) She was cleared to return to work on June 21, 2004, with restrictions against lifting or carrying more than ten pounds. (R.171.) On November 18, 2004, her doctor made these work restrictions permanent and added that she should not work at or above right shoulder level. (R. 147.) The record does not indicate Rheam sought treatment for her shoulder after this date.

Rheam did seek treatment for fibromyalgia every few months for about two years beginning in January 2005. (R. 223-29, 303-04.) At a December 2005 visit, Rheam's treating nurse noted that Rheam was trying to manipulate her medications and advised that she should instead use self-help means of pain control. (R. 223.) The nurse was evidently concerned that Rheam may have been using here medications in an improper way and flatly turned her down her request for a prescription for Xanax (which she called "Xannies"). (*Id.*) The nurse told Rheam that if she needed something for her nerves she would need to see a psychiatrist. (*Id.*) She repeated this admonition in September 2006. (R. 304) In January 2007, Rheam was discharged in good condition and advised to consider physical or water therapy. (R. 303.)

At the July 6, 2007 hearing, Rheam complained of depression, anxiety, irritable bowel syndrom and post-traumatic stress disorder. (R. 479-81.) In November 2002, she was prescribed Wellbutrin and advised to seek psychiatric counseling for her depression. (R. 186.) Her treating physician noted that Rheam had a "slightly flat affect" but the she did not appear to have suicidal or personally-harmful thoughts. (R. 186.) As noted above, Nurse Practitioner Wright, who treats Rheam for fibromylagia, noted Rheam's depression and anxiety in June 2006 and January 2007, but refused to prescribe any medication and suggested that Rheam seek treatment from a psychiatrist. (R. 223, 304.) However, there is no medical evidence in the record regarding treatment for Rheam's purported psychiatric condition or irritable bowel syndrome.

On February 28, 2005, a state agency physician completed a Residual Function Capacity (RFC) Assessment of Rheam. (R. 200-07.) The physician noted that Rheam has fibromyalgia with shoulder and back pain. (R. 202.) According to the state physician's opinion, Rheam had no postural, manipulative, visual, communicative or environmental limitations; could occasionally lift or carry up to fifty pounds; could frequently lift and/or carry and upward pull up to twenty-five pounds; could stand and/or walk with normal breaks for approximately six hours in an eight-hour workday; and could sit with normal breaks for about six hours in an eight-hour workday. (R. 201.)

On March 16, 2006, Rheam underwent a psychological consultation to evaluate her vocational aptitude and capacity. (R. 429.) Based on the examiner's test results, Rheam functions within the average to low average range of general intelligence. (R. 436.) The examiner noted that Rheam especially struggles in the academic areas of language arts, written language and math. (R. 434.) He concluded that Rheam would benefit from direct instruction in reading, and psychotherapy to "encourage her and provide support for her as she progresses toward a vocational or occupational goal." (R. 437.)

At the hearing Rheam, her boyfriend Ricky Allen Cole and vocational expert Robert Bond testified. (*Id.*) The ALJ asked Bond to consider whether jobs would exist in the national economy for someone with Rheam's age, education and work history who would be limited to simple, routine, and repetitive tasks and who could read and spell at the fourth-grade level, and perform math at the fifth-grade level. (R. 499.) Bond asserted that someone with these limitations could perform the following jobs: routing clerk (approximately 200 jobs in the regional area), classifier/sorter (approximately 250 jobs in the regional area), and checker (approximately 125 jobs in the regional area). (R. 499-500.) The ALJ then asked Bond whether

4

jobs would exist in the national economy for someone who would also need to occasionally change positions throughout the eight-hour workday but could pay attention to the task at hand. (R. 500.) Bond concluded that someone with these additional limitations could perform the same job titles but that there would only be 150 classifier/sorter jobs in the regional area. (*Id.*)

The ALJ therefore denied Rheam's claim, finding that she was not disabled under the Social Security Act on the grounds that Rheam had the RFC to perform a substantial number of jobs in the national economy. (R. 17.) The Appeals Council denied Rheam's request for review and this appeal followed. (R. 3-5.)

## II. DISCUSSION

In her one-page appeal to this Court, Rheam claims that she is disabled due to chronic pain in her lower back and left leg and is unable to work. Rheam also asserts that her learning disabilities negatively effect her ability to find employment. She does not point to anything specific, but appears to challenge generally the ALJ's determination that she is not disabled.

An applicant for disability insurance benefits must establish "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505. The SSA's regulations prescribe the familiar five-step sequential inquiry for an ALJ to determine whether an applicant is disabled: (1) whether the claimant is currently employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling; (4) if the claimant does not have a conclusively disabling impairment, whether she can perform his past relevant work; and (5) whether the claimant is capable of performing any work in the national economy. *Dixon v. Massanari*, 270 F.3d 1171,

5

1176 (7th Cir. 2001); 20 C.F.R. §§ 404.1520, 416.920.

In reviewing the ALJ's decision, I cannot re-weigh evidence, choose among conflicting versions of events, decide questions of credibility, or substitute my own judgment for the ALJ's. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Instead, my review is limited to determining whether the decision is supported by substantial evidence. *Rice v. Barnhart*, 384 F.3d 363, 369-70 (7th Cir. 2004). "Evidence is substantial if a reasonable person would accept it as adequate to support the conclusion." *Young*, 362 F.3d at 1001. In other words, the ALJ's decision, if supported by substantial evidence and reached under the correct legal standard, shall be upheld even if reasonable minds could differ as to the appropriate conclusion. *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000).

Rheam easily satisfied the first two steps of the five-step inquiry. She was not employed at the time of her hearing and had sparse employment since February 8, 2003. And she had several severe impairments including: post-traumatic chondromalacia in her left knee, chronic right shoulder impingement in her rotator cuff, chronic back and neck pain due to degenerative disc disease, fibromyalgia, depression, anxiety, post-traumatic stress disorder, reading and written language disorders, and low math ability. (*Id.*) The ALJ did not consider Rheam's assertion that she suffered from irritable bowel syndrome because she did not present any diagnostic evidence as to that condition. (R. 14.)

At Step Three, the ALJ is required to determine whether the applicant's impairment meets or medically equals all the criteria of an impairment in the SSA's Listing of Impairments. 20 C.F.R. § 404.1525; 20 C.F.R. Pt. 404, Subpt. P, App. 1. The ALJ in this case found that Rheam was not disabled per se because her physical impairments did not meet any musculoskeletal impairment on the list and her mental impairments were only secondary to her physical

6

impairments. (*Id.*) On the latter point, the ALJ reasoned that Rheam had only been diagnosed with anxiety and depression by physicians treating her physical injuries; but she never sought treatment for her alleged mental illnesses. (R. 14-16.) Moreover, the ALJ concluded that Rheam's mental impairments only limited her mildly or moderately, but fell short of the criteria for a listed impairment. (R. 16.) Rheam's medical records do not contradict the ALJ's findings since there are no evidence of psychiatric treatment in the record.

In order to evaluate Steps Four and Five, the ALJ must first determine the applicant's Residual Functional Capacity (RFC), which is a measure of the claimant's abilities to work despite her impairment. 20 C.F.R. § 404.1545. The determination of one's RFC is not a medical conclusion, but rather an administrative finding based on the ALJ's evaluation of the record, including all relevant medical and non-medical evidence and the claimant's own statement of what she is able or unable to do. 20 C.F.R. § 404.1527; *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995). The ALJ concluded here that, despite Rheam's impairments, she has the capacity to perform light work (where she could occasionally change positions), with occasional postural maneuvers, and was limited to simple, routine, repetitive tasks for someone at a fourth grade reading and spelling level, and a fifth grade math level. (R. 16-17.)

In making his determination, the ALJ examined Rheam's medical records, her testimony and the state's RFC assessment. (R. 17-21.) The ALJ considered the state agency physicians' determination that Rheam could work at a medium exertional level, but gave her the benefit of the doubt hat she could only work at a light exertional level due to the fact that she had been receiving continuing pain management therapy and treatment for her lower back and fibromyalgia. (R. 20.) But the ALJ found Rheam's alleged level of pain to be inconsistent with the record. At the hearing, Rheam asserted she was very limited by pain in her daily activities

7

and could only remain standing for approximately ten minutes at a time. (R. 471, 477, 479, 484-91.) She further complained that her pain would get so bad that she would have to lie down for thirty minutes every two hours. (R. 477, 484-85.) The ALJ was not persuaded by these allegations, since they were not supported by Rheam's medical records. (R. 18, 21, 233-301, 311-428.) According to recent examinations, her conditions had become fairly stable and clinical findings did not support the levels of pain that she claimed at the hearing. (R. 233-301, 311-428.) In fact, a recent examiner suggested that Rheam be evaluated by a neuro-psychiatrist to rule out any psychosomatic cause of her pain. (R. 196.)

In evaluating her physical limitations, the ALJ noted that both Rheam's knee and back problems arose well before the alleged onset date of February 8, 2003. (R. 18-19). Rheam had back surgery in 1998 and her left knee was injured in an automobile collision in 1999, which required surgery in 2001; but she continued to work as a production worker until 2003, when her employer went out of business. (R. 18-19.) The ALJ further pointed out that Rheam did not lose any of her jobs due to her alleged disability. (R. 13, 18.) In addition, the ALJ concluded Rheam's shoulder problems were limited in duration, based on the fact that Rheam had surgery on her shoulder in June 2004, but only received treatment from May 2004 to November 2004. (R. 19, 146-76). The ALJ discounted the fact that Rheam was placed on a permanent ten-pound weight restriction in November 2004 because there is no further evidence of ongoing treatment. (R. 19-20.) Indeed, a January 2005 physical examination revealed that Rheam had a full range of movement and suffered no pain under passive resistance in her right shoulder. (R. 196.)

As to Rheam's mental RFC, the ALJ determined that Rheam is limited to simple, routine, repetitive tasks due to her low level reading, spelling, and math abilities. (R. 21.) This finding is supported by Rheam's Vocational Rehabilitation Psychoeducational Evaluation, in which the

examiner determined that Rheam performed at a fourth-grade reading and spelling level, and a fifth-grade math level. (R. 434.) Based on his test results, the examiner determined that Rheam functions within "the average to low average range of general intelligence." (R. 436.)

The ALJ's conclusion regarding Rheam's RFC is not the only conclusion that can be drawn from the evidence. A reasonable person could have found that the evidence supported a more or less restrictive RFC. Though reasonable minds may differ, that does not mean the ALJ's conclusions were unreasonable. The ALJ adequately supported his decision with substantial evidence in the record and demonstrated why he found some evidence more credible than others. I will not reweigh the evidence on review or substitute my judgment for that of the ALJ's when there is – like in this case – substantial evidence to support it.

Having construed Rheam's RFC, the ALJ determined at Step Four that Rheam was unable to perform past relevant work because vocational expert Bond testified that Rheam performed her production worker/inspector job at a medium exertion level, and she could now only perform light work. (R. 20-22.) However, the ALJ concluded at Step Five that Rheam was able to perform a substantial number of jobs in the national economy. (R. 22.) Bearing in mind Rheam's age, education, work history, and RFC, Bond testified there would be significant jobs in the national economy for a person with Rheam's limitations. (R. 497-501.) Relying on Bond's testimony, the ALJ thus concluded that Rheam was capable of making a successful adjustment to other work and as a result was "not disabled." (R. 23.) This conclusion is consistent with the ALJ's determinations regarding Rheam's limitations and is substantially supported by evidence in the record.

### III. CONCLUSION

The ALJ provided legitimate reasons for his decision, demonstrated consideration of all

9

the medical and non-medical evidence in the record, and adequately explained why he weighed some evidence more favorably than others. Therefore, the Court **AFFIRMS** the judgment of the Administrative Law Judge that Rheam has not been disabled since February 8, 2003.

**SO ORDERED**.

ENTERED: January 20, 2009

                                          s/ Philip P. Simon
                                          PHILIP P. SIMON, JUDGE
                                          UNITED STATES DISTRICT COURT